NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-1568

MELANIE AUSTIN

v.

NORFOLK SOUTHERN CORPORATION;
CONSOLIDATED RAIL CORPORATION,

Appellants

Appeal from the United States District Court
for the Western District of Pennsylvania
(Civ. No. 00-cv-01713)
District Judge: Hon. Robert J. Cindrich

Argued: March 8, 2005

Before: McKEE, RENDELL and NYGAARD, <u>Circuit Judges</u>

(Opinion filed:  December 14, 2005)

JAMES S. WHITEHEAD, ESQ.  (Argued)
Sidley Austin Brown & Wood LLP
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603

THOMAS H. MAY, ESQ.
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222

<u>Attorneys for Appellants</u>

1

ZAN IVAN HODZIC, ESQ.  (Argued)
Hodzic & Porach LLC
Suite 308
1100 Washington Avenue
Carnegie, PA 15106

Attorney for Appellee

_____

OPINION

_____

McKEE, Circuit Judge.

Norfolk Southern Corporation and Consolidated Rail Corporation ("Conrail") appeal the district court's denial of their motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59 following a jury verdict in favor of Melanie Austin on her claims of sexual harassment, negligent supervision and retaliation.   For the reasons that follow, we hold that the district court erred in denying the motions for judgment as a matter of law on all of Austin's claims. Therefore, we will reverse, and direct the district court to enter judgment in favor of Norfolk Southern and Conrail, and against Austin on each of her claims.

## I. FACTS

Inasmuch as we are writing primarily for the parties, we need not set forth the factual or procedural background of this case in detail. Accordingly, we will only briefly summarize the background of this dispute.

2

Austin began working for Conrail's predecessor in August, 1991, and became a Conrail employee in May, 1993. She worked for Conrail until June 1, 1999, when she became an employee of Norfolk Southern Railway Company, a subsidiary of Norfolk Southern Corporation, following Norfolk Southern's acquisition of certain Conrail properties. When this case was argued, she was still employed by Norfolk Southern as a locomotive engineer.

Austin claimed that, beginning on October 8, 1998 and continuing to May 31, 1999, she was subjected to sexually harassing conduct on the part of several of her fellow Conrail employees. The conduct included offensive graffiti and offensive comments she overheard on the company radio. She reported the incidents to her Conrail superiors, and they took various steps in response including, *inter alia*, interviewing the employees Austin believed were responsible for the offensive conduct, posting and re-issuing Conrail's sexual harassment policy, and inspecting company property (i.e., the locomotives) for graffiti. Conrail claimed that it was unable to identify the employees responsible for the offensive conduct.

Austin further claimed that she was subjected to displays of photographs of nude women as well as instances of offensive graffiti while an employee of Norfolk Southern. Finally, she claimed that her 30 day suspension by Norfolk Southern without pay purportedly because she referred to another employee as a "pervert" in violation of Norfolk Southern's sexual harassment policy, was actually illegal retaliation for her attempts to end

3

the sexual harassment.

## II.  PROCEDURAL HISTORY

Austin filed a complaint against Conrail and Norfolk Southern asserting a claim of sexual harassment pursuant to Title VII of the Civil Rights Act of 1964, as amended; a claim of retaliation pursuant to Title VII; and a state law claim of negligent supervision. After a three day trial, a jury found in favor of Austin and against Norfolk Southern on her sexual harassment, retaliation and negligent supervision claims; in favor of Austin and against Conrail on her sexual harassment and negligent supervision claims; and in favor of Norfolk Southern on her retaliation claim.   The jury awarded compensatory damages of $50 against both Conrail and Norfolk Southern for sexual harassment; $0 against Norfolk Southern for retaliation; and $100,000 against both Conrail and Norfolk for negligent supervision.  Finally, the jury awarded $250,000 in punitive damages against Norfolk Southern on the retaliation claim.  The district court subsequently remitted the latter award to $175,000, and awarded Austin attorneys' fees, costs and interest.

This appeal followed.

## III.  STANDARD OF REVIEW

We exercise plenary review of an order granting or denying a motion for judgment as a matter of law.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted).

Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and

4

reasonable inference, there is insufficient evidence from which a jury could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Id.* (citations and internal quotations omitted).

## IV. DISCUSSION

### A. Sexual Harassment under Title VII.

29 C.F.R. § 1604.11, provides, in relevant part, as follows:

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
. . .
(d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

29 C.F.R. § 1604.11 (2005).

### (I). Conrail.

In reviewing the denial of Conrail's motion for judgment as a matter of law, we must

determine whether a reasonable jury could have found that Conrail failed to take

"immediate and appropriate corrective action" to stop Austin's fellow employees from

5

sexually harassing her.   We do not believe that a jury could reasonably conclude that

Conrail failed to take corrective action given the evidence here.   Admittedly, Conrail was

never able to determine who wrote the offensive graffiti or who made the offensive

comments over the radio.   However, Conrail's supervisors met frequently with Austin,

posted notices of Conrail's sexual harassment policy, interviewed the employees Austin

identified as suspects, included sexual harassment training in its safety meetings, inspected

locomotives for graffiti, and removed graffiti.   Conrail even went so far as to contact

Austin's local union representative and ask him to address the subject of graffiti with the

union's members.

Moreover, Conrail's corrective response was effective.   Austin took photographs of

the offensive graffiti.   She photographed eleven instances of graffiti in September, October

and November.   However, she photographed no graffiti during December, 1998.   She saw

only four instances of graffiti in January, 1999 and only two in February, 1999.   Austin did

not testify that she saw any graffiti at Conrail after February, 1999, or that she heard any

inappropriate radio comments after December 6, 1998.[1]

Accordingly, we believe that the district court erred in denying Conrail's motion for

---

[1]Austin attempts to use the fact that Meese gave her a bottle of acetone to use to
erase any offensive graffiti she found on locomotives as evidence that there was an
environment of sexual harassment and a failure by Conrail to take effective corrective
action. However, her attempt is misleading.  Conrail inspected the locomotives Austin was
scheduled to operate for offensive graffiti and had any such graffiti removed.  Meese gave
the acetone to Austin to remove graffiti she found offensive only in those instances were
she worked alone and there was no one else present who could remove it.

judgment as a matter of law on Austin's sexual harassment claim.

### (ii).  Norfolk Southern.

Austin testified about three instances of sexual harassment after she became a Norfolk Southern employee on June 1, 1999. They included one instance of vulgar graffiti on a locomotive in September, 1999; the phrase "Psycho B-C-H" painted on a tower owned by Boswell Oil Company; and a Playboy magazine pin-up posted in a mine shed owned by a Norfolk Southern customer in February 2000.

However, these three instances are insufficient to allow a reasonable jury to find Norfolk Southern liable for failing to take corrective action to prevent the creation of an "intimidating, hostile, or offensive working environment."  Although Austin saw one instance of vulgar graffiti on a Norfolk Southern locomotive, she never described the graffiti or said why she considered it vulgar.  A Title VII hostile environment claim requires proof of pervasive or severe intentional discrimination that affected the plaintiff and would also affect a reasonable person. *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 107 (3d Cir. 1994).  Absent evidence of the nature of the graffiti, the jury could not properly conclude that it was sufficiently pervasive or offensive to support a cause of action.

The remaining two instances of graffiti did not occur on property owned by Norfolk Southern.  Austin did not produce evidence that the property was under Norfolk Southern's control, nor did she produce evidence linking those instances to fellow Norfolk Southern employees.  Although it is arguable that the jury might infer that Norfolk Southern

employees were responsible for the graffiti, and even that "psycho B C H" referred to

Austin, those two instances do not constitute an environment of harassment sufficiently

severe to support a cause of action for sexual harassment. Moreover, we do not understand

what more Norfolk Southern could have done to learn the identity of the perpetrator(s), or

stop the graffiti sooner.

Thus, the district court should have granted Norfolk Southern's motion for judgment

as a matter of law on Austin's sexual harassment claim.

### B.  Negligent Supervision.

As noted above, Austin asserted state law negligent supervision claims against

Conrail and Norfolk Southern.  All parties agree that Pennsylvania law governs this claim

and that Pennsylvania courts look to the Restatement (Second) of Torts, § 317 to determine

an employer's liability for the negligent supervision of its employees.  *See, e.g., Hutchinson*

*by Hutchinson v. Liddy*, 742 A.2d 1052, 1062 (Pa. 1999).  Austin's negligent supervision

claim was sent to the jury without objection to the following instruction:

\     [Austin's] third claim, negligent supervision is asserted under Pennsylvania
      law.  Under Pennsylvania law, an employer has a duty to exercise reasonable
      supervision over its employees to prevent sexual harassment in the
      workplace.

                          * * * * * * * * * * * * * *

      Last, we'll discuss negligent supervision.  In order to prevail on her
      negligent supervision claim, [Austin] must prove each of the following
      essential elements by a preponderance of the evidence.

First, that [Conrail and Norfolk Southern] had the ability to control their employees.  Second, that [Conrail and Norfolk Southern] knew or should have known of the necessity and opportunity for exercising such control of their employees.  Third, that [Conrail and Norfolk Southern] negligently failed to control their employees.  And, fourth, that [Austin] was injured as a result of [Conrail's and Norfolk Southern's] failures.

Therefore, you can only find for [Austin] if you find that [Austin] has proved by a preponderance of the evidence that [Conrail and Norfolk Southern] knew or in the exercise of ordinary care should have known of the improper activities or their employees and then failed to take appropriate supervisory action.  *Even if you find the behavior of [Austin's] co-workers to have been improper, you must find for [Conrail and Norfolk Southern] if you find that [Conrail and Norfolk Southern] exercised reasonable care in responding to [Austin's] complaints and in taking appropriate action.*

App. 459, 467 (emphasis added).

Given the controlling legal principles, Austin's state law negligent supervision claim is little more than a restatement of her Title VII sexual harassment claim, and our discussion of her title VII claim applies with equal force to her negligent supervision claim. Accordingly, for the reasons set forth above, we believe the district court erred in denying Conrail and Norfolk Southern's motions for judgment as a matter of law on that claim as well.[2]

## C.  Retaliation.

---

[2]Conrail and Norfolk Southern argue, *inter alia*, that the district court erred in denying their motions for judgment as a matter of law because § 317 of the Restatement requires proof of bodily injury and that Austin produced no evidence of any bodily injury. Appellants' Br. at 27-30.  However, since Austin has not demonstrated the required negligence, we need not respond to the assertion that that Restatement requires proof of bodily injury.

On May 27, while employed by Conrail, Austin had a radio conversation with a Conrail dispatcher. After Austin and the dispatcher became Norfolk Southern employees, the dispatcher, an acknowledged homosexual, complained that Austin had called him a pervert during the course of that radio conversation. Norfolk Southern reviewed a tape recording of that conversation and determined that Austin did in fact call the dispatcher a pervert. Following a disciplinary hearing, Norfolk Southern suspended Austin for thirty days without pay for violating Norfolk Southern's sexual harassment policy. Austin appealed the suspension and an arbitration board reversed it and awarded back pay for the period of the suspension.[3]

Austin asserted that Norfolk Southern's proffered reason for suspending her was a pretext and that she was really suspended for complaining about sexual harassment while a Conrail employee. The jury agreed, and the district court denied Norfolk Southern's motion for judgment as a matter of law on that claim.

However, we believe that there is insufficient evidence to support the jury's conclusion that Norfolk Southern's reason for suspending Austin was a pretext for illegal retaliation. Admittedly, there is evidence, which at first blush, could support a finding of pretext. Austin testified to an incident which occurred in October 1989, when she

---

[3]Norfolk Southern gave a copy of the tape to Austin's union which sent the tape to an outside expert for analysis. The expert concluded that the word "pervert" was spoken on the tape. After listening to the tape several times, the arbitration board reversed the suspension because it could not make a clear and unequivocal finding that Austin had actually used the term.

overheard two Conrail employees joking about graffiti. She reported the incident to

Conrail's Road Foreman of Engines, Curtis Meese, who met with the two employees.

They told Meese that they were joking, that they understood Conrail's policy on sexual

harassment and that they would not joke about the graffiti again. They were not

disciplined, yet Austin was suspended for violating the sexual harassment policy.

However, the problem with Austin's claim of pretext arises from the fact that she

worked for two companies – Conrail and then Norfolk. Conrail did not suspend her;

Norfolk did. Austin offered no evidence that any other Norfolk employee had violated the

company's sexual harassment policy without being suspended. Therefore, we can not find

pretext based on the Meese incident without imputing Conrail's failure to discipline to

Norfolk. However, Austin offers no authority for the proposition that a former employer's

conduct can be imputed to a subsequent employer to show retaliation by the latter.

Austin appears to argue that Conrail's failure to discipline the employees Meese

spoke with can be imputed to Norfolk because of the "seamless" integration of the

operations of the two companies. For example, she writes: "It should be noted the evidence

was *undisputed* there was no interruption in operations and procedures as a result of

acquisition. (As a matter of fact, the same relevant personnel retained their positions and

became the respective employees of Norfolk Southern.)" Austin's Br. at 4-5 (emphasis in

original). However, she offers no record citation to support these statements, and there is

testimony to the contrary. O'Donnell, Conrail's director of equal employment, testified that

11

on June 1, 1999, Conrail's multi-state operations were divided between Norfolk and CSX, but that Conrail did not go out of business. It retained small railroad freight operations in Detroit, northern New Jersey and the Philadelphia area. App. 329. O'Donnell also testified that he remained with Conrail but had nothing to do with either Norfolk or CSX. *Id.*

The district court based Norfolk's liability for sexual harassment on the theory of successor liability. App. 9. That might be the source of Austin's seamless integration argument on her retaliation claim. However, the district court erred in relying upon successor liability.

"In general, in the context of employment discrimination, the doctrine of successor liability applies where the assets of the defendant employer are transferred to another entity." *Rego v. ARC Water Treatment Co. of Pa.*, 181 F.3d 396, 401 (3d Cir. 1999). "The doctrine allows an aggrieved employee to enforce against a successor employer a claim or judgment he could not have enforced against the predecessor." *Id.* There are "three principal factors" applicable to finding successor liability in employment discrimination cases: "(1) continuity in operations and work force of the successor and predecessor employers; (2) notice to the successor employer of its predecessor's legal obligations; and (3) ability of the predecessor to provide adequate relief directly." *Id.* at

402.  At most, the district court addressed only the first factor.[4]

   Moreover, even if it is assumed for argument's sake that successor liability existed, it would still not support Austin's claim against Norfolk. Under that doctrine, Norfolk would be liable as Conrail's successor for discriminatory acts suffered by Austin while a Conrail employee if she was unable to satisfy a judgment or claim against Conrail. However, we have been unable to find any successor liability case that would permit a jury to impute Conrail's failure to discharge employees who violated its sexual harassment policy to Norfolk and thus find that Norfolk retaliated against Austin when she was disciplined for violating its own sexual harassment policy.[5]

   Accordingly, the district court erred by denying Norfolk Southern's motion for judgment as a matter of law on the retaliation claim.[6]

---

[4]In its opinion, the district court wrote that there was never a distinction drawn between Norfolk and Conrail and it observed that the same counsel represented both entities. Yet, the district court charged the jury that it had to consider the evidence against each entity separately.

[5]The water is even muddier here because Austin purportedly called the dispatcher a pervert while both were Conrail employees. However, he did not report it until both had become Norfolk employees. As Norfolk argues: it "was presented with a complaint by [a Norfolk] employee about conduct that potentially poisoned the working relationship at [Conrail]."  Reply Br. at 27.

[6]We also note that there are serious flaws in the district court's disposition of Norfolk Southern's motion for a judgment of law on the retaliation claim. In denying that motion, the district court wrote, *inter alia*:

   Viewing the evidence in a light most favorable to Austin, and giving her the
                                               (continued...)

## V.  CONCLUSION

For all of the above reasons, we will reverse the district court's denial of Conrail's

_____

[6](...continued)
advantage of every fair and reasonable inference, a jury reasonably could find
that this proffered reason for the suspension was a pretext.  For example, the
company went to the effort of obtaining a voice analysis of the radio
broadcast to determine whether Austin uttered the work "pervert."  Although
Austin had previously complained of harassment on numerous occasions,
including over the radio, the company never went to such extreme lengths to
identify those offending individuals.  Indeed, this glaring inconsistency in and
of itself would support a finding of pretext.

App. 10.  However, this is inaccurate. Norfolk did not send the tape for voice analysis to
identify Austin or to determine if she used word "pervert" on its own.  Rather, Norfolk
provided a copy of the tape to Austin's union.  It did so because of a grievance that was
properly filed.  The union then sent the tape for an independent analysis.  *See* n.2, *supra*.
Therefore, we do not see any "glaring inconsistency."

Furthermore, in finding pretext based upon Norfolk Southern's sexual harassment
policy, the district court wrote:

There were also weaknesses in the company's claim that uttering the word
pervert violated the sexual harassment policy.  The company claimed that it
was concerned that an openly gay employee may have perceived such
comment as being directed at him.  There is nothing inherently gender related,
however, in the word pervert.  Moreover, even if a gay employee had been
offended by such comment, sexual preference is not a protected category
under Title VII and therefore would not have been a violation of the sexual
harassment policy.

App. 10.   However, as Norfolk correctly notes, an employer can certainly adopt a
harassment  policy that gives greater protection against sexual harassment than Title VII.
Moreover, Norfolk has operations in states where sexual preference discrimination is
prohibited under state law, and it is therefore not evidence of pretext that it had adopted a
policy that complies with the more generous law of those states.

14

and Norfolk Southern's motions for judgment as a matter of law on each of the claims discussed above.[7]


**NYGAARD**, *Circuit Judge*, Dissenting in part.

I join those sections of the Majority opinion that reverse the District Court's denial of Conrail and Norfolk's motions for judgment as a matter of law on Austin's claims of hostile work environment, negligent supervision.   I disagree with the Majority's treatment of Austin's retaliation claim and would affirm the District Court on that issue.

## I.  The Retaliation Claim

To analyze a claim of illegal retaliation, we must follow a modified version of the burden shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).  First, a plaintiff must establish a *prima facie* case of retaliation by showing: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action either after or contemporaneous with the protected activity; and (3) the existence of a causal connection between the protected activity and the adverse employment action.  *Id*.  If a plaintiff establishes the *prima facie* case, the burden of production shifts to the employer to

---

[7]Our reversal of the denials of the motions for judgment as a matter of law "implicates the decision not only of the trial court, but also the verdict of the jury." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990).  Accordingly, our decision negates the award of punitive damages as well as of the awards of attorneys' fees, costs and interest to Austin.

"articulate some legitimate, nondiscriminatory reason" for its adverse employment action.
*Id.* At that point, a plaintiff must prove that the proffered reason was merely a pretext and
that in actuality, a retaliatory animus played a determinative or at least a motivating role in
the employer's decisionmaking process. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d
183 (3d Cir. 2003). To do this, a plaintiff must "demonstrate such weaknesses,
implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable factfinder *could* rationally find them
unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citation and
quotation omitted).

Austin's claim of retaliation stems from her thirty-day suspension for allegedly
calling her co-worker a pervert. She claims that the suspension was actually in retaliation
for her complaints of sexual harassment. Norfolk Southern counters that Austin was
suspended because she violated the company sexual harassment policy. The jury returned a
verdict in favor of Austin on this claim and Norfolk Southern filed motions for judgment as a
matter of law and a new trial, both of which the District Court denied. Although not entirely
clear from its brief, on appeal, it seems Norfolk Southern contends that Austin failed to
demonstrate either the causal connection prong of the *prima facie* case or that its proffered
legitimate, nondiscriminatory reason was a pretext for retaliatory animus. I reject this
argument.

When viewed in the light most favorable to Austin, a jury could have reasonably

16

found both the existence of a causal connection between her complaint and her suspension and that retaliatory animus played a role in Norfolk Southern's decision to suspend her. This conclusion is supported by the fact that Norfolk Southern sent out the tape of Austin allegedly calling a co-worker a pervert for expert analysis and yet the same was not done for the radio comments others made about her.  It is true, as Norfolk Southern points out, that Conrail was Austin's employer at the time of the offensive radio comments about her. Nevertheless, much as Austin did, nearly all of the relevant decisionmakers at Conrail took similar positions with Norfolk Southern.  Armed with this piece of evidence, a jury could reasonably have concluded that Norfolk Southern's articulated reason for suspending Austin—that she violated the sexual harassment policy—was at least partially motivated by a desire to retaliate against her for complaining about sexual harassment a few months earlier.  *Cf. Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) (noting that suspect timing, ongoing antagonism between employee and employer, and other circumstantial evidence may suffice to establish the causal connection prong of a *prima facie* retaliation claim).  Thus, Norfolk Southern's request for judgment as a matter of law must fail and, in my view, the District Court correctly denied the motion.

Norfolk Southern's motion for a new trial fails for the same reason.  When a jury verdict against the weight of the evidence results in a miscarriage of justice or shocks the conscience, a new trial should be ordered.  *Greenleaf*, 174 F.3d at 365.  However, we review a district court's determination on that question for abuse of discretion.  *Id*. Although

17

the evidence in this case suggests that Austin did in fact violate the company sexual

harassment policy, and that Norfolk Southern's suspension of Austin was done for a

legitimate reason, the differing treatment of the radio comments supports a contrary

conclusion.   Because there is some evidence supporting the jury's verdict, I cannot say the

District Court abused its discretion by holding that the verdict was not so against the weight

of the evidence that it shocks the conscience or resulted in a miscarriage of justice.  I would

affirm the District Court's denial of Norfolk Southern's motions for judgment as a matter of

law and for a new trial on Austin's retaliation claim.

## II.  Punitive Damages

Although I would hold that Austin prevailed on her retaliation claim against Norfolk

Southern, it is important to note that the jury awarded her no compensatory damages

because her suspension was overturned by an arbitration panel and she received full back

pay for the days of work she missed.  The jury did award her $250,000 in punitive damages,

which the District Court remitted to $175,000.  Inasmuch as the Majority reverses the

District Court on Austin's retaliation claim, it does not discuss Norfolk Southern's argument

that the award of punitive damages was excessive and a violation of due process.

Due process prohibits grossly excessive or arbitrary punitive damage awards.

*Campbell*, 538 U.S. at 416.[8]  In determining whether a punitive damages award is grossly

───────────────────

[8]  More accurately, the Supreme Court has held that the Due Process Clause of the
Fourteenth Amendment prohibits state courts from imposing grossly excessive punitive
damages against tortfeasors.  *Campbell*, 538 U.S. at 416. The Court has not determined

(continued...)

excessive, courts must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id*. (citing *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996)). Each of these guideposts demonstrates that the punitive damages awarded in the present case cannot stand consistent with due process. I would reverse the District Court on this claim.

### A.  *Reprehensibility*

The Court has held that the degree of reprehensibility of the defendant's conduct is the "most important indicium" of the constitutionality of a punitive damages award. *Campbell*, 538 U.S. at 419.  In measuring the degree of reprehensibility, we are to consider: whether the harm caused was physical as opposed to economic; whether the defendant's actions evinced indifference to or reckless disregard for the health and safety or others; the financial vulnerability of the victim; whether the conduct was repetitive or isolated; and

---

[8](...continued)
whether this prohibition applies equally to the imposition of punitive damages in federal court for a violation of Title VII through the Due Process Clause of the Fifth Amendment or otherwise.  This Court has not addressed the issue either; nor did the District Court or either party.  Several Courts of Appeal, however, have applied the standard enunciated by the Supreme Court for grossly excessive punitive damage awards in state courts to Title VII cases.  *See, e.g. MacGregor v. Mallincrodkt, Inc*., 373 F.3d 923, 932–33 (8th Cir. 2004); *E.E.O.C. v. Harbert-Yeargin*, *Inc*., 266 F.3d 498, 514 (6th Cir. 2001); *E.E.O.C. v. W&O, Inc*., 213 F.3d 600, 614–17 (11th Cir. 2000); *Romano v. U-Haul, Int'l*, 233 F.3d 655, 672–74 (1st Cir. 2000); *Deters v. Equifax Credit Info. Sys., Inc*., 202 F.3d 1262, 1272–73 (10th Cir. 2000).

whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id*. The absence of all of these factors renders suspect a punitive damages award, but the existence of any one is not necessarily sufficient. *Id*.

The only factor in the reprehensibility analysis that is even arguably present here is the existence of intentional malice in the suspension of Austin, and that factor is questionable. It appears from the record that Norfolk Southern reasonably believed Austin violated the company sexual harassment policy. It got independent expert confirmation that she referred to a homosexual co-worker as a pervert. Because its sexual harassment policy prohibited offensive comments on the basis of sexual orientation, Norfolk Southern deemed this comment to be a violation of company policy. Its suspension of Austin, therefore, appears to be in good faith.[9]

Moreover, no other factor in the analysis is present. To the extent Austin suffered any harm from her suspension, *see Part II, B., infra*, it was economic not physical. There is no evidence Norfolk Southern was indifferent to her health or safety. Nor is there evidence that the suspension put her in a financially vulnerable position. And, finally, the suspension

---

[9] This holding may seem inconsistent with the holding in Part III, *supra*, that the jury could have reasonably found Austin's suspension to be retaliatory, but it is not. Our ability to weigh the evidence is far greater when reviewing the award of punitive damages for excessiveness than it is when reviewing a jury verdict on a motion for judgment as a matter of law or for a new trial. *See Campbell*, 538 U.S. at 418 (noting that appellate courts must conduct *de novo* review for claims regarding the excessiveness of punitive damages awards). Thus, we may import our own opinion as to the motivations behind Norfolk Southern's conduct more freely on the question of punitive damages than we may when reviewing the verdict on the retaliation claim itself.

was an isolated, not a repeated, incident.  For these reasons, the degree of reprehensibility of Norfolk Southern's conduct—the most important indicium of the constitutionality of a punitive damages award—is at most, rather slight.

### B.  Disparity Between the Actual or Potential Harm Suffered and the Punitive Damages Awarded

The Court has not set "concrete constitutional limits" on the permissible ratio between the actual or potential harm suffered by the plaintiff and the punitive damages awarded.  *Id.* at 424.  It has cautioned, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  *Id.* at 425.  A larger ratio may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."  *Gore*, 517 U.S. at 582.  In essence, a reviewing court must determine whether the amount of punitive damages awarded is "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *Campbell*, 538 U.S. at 426.

The amount of punitive damages awarded to Austin for her retaliatory suspension was neither reasonable nor proportionate when compared to the actual or potential harm to her from that suspension.  According to the jury, Austin suffered no actual harm; it awarded her nothing in compensatory damages.  That award indeed appears correct.  Austin lost no wages from her suspension because she was reinstated with full back pay by the arbitration panel.  Had she not been reinstated, her potential harm would have been realized as the loss

21

of thirty days' pay.  Unless Austin's salary as an engineer was $14,583.33 a month—an almost unbelievable figure—the $175,000 in punitive damages exceeded the 10:1 ratio set forth by the Court as a benchmark.  *See Campbell*, 538 U.S. at 425.  In all probability, the ratio went well beyond 10:1.

While a "particularly egregious act" by a defendant causing only a small amount of economic damages can support a larger ratio, there does not appear to be any such egregious conduct by Norfolk Southern here.  As discussed more fully in Part IV.A., *supra*, Norfolk Southern did not appear to have physically harmed Austin or have taken advantage of her financial vulnerability.  Nor did it act in bad faith.  On the contrary, it participated in the arbitration proceedings concerning Austin's suspension and abided by the arbitration panel's decision reinstating Austin with full back pay.

Austin suffered no actual harm from her suspension.  At most her potential harm was the loss of thirty days' salary.  By contrast, Austin received $175,000 in punitive damages, a figure that dwarfs even her potential harm.

C.  *Difference Between the Punitive Damages and the Civil Penalties Authorized or Imposed in Comparable Cases*

Pursuant to statute, the maximum allowable award of non-economic damages for a violation of Title VII by an employer with over 500 employees is $300,000.[10]  42 U.S.C. § 1981a(b)(3)(C).  Because the punitive damage award was well under the statutory cap, this

---

[10]  As of December 31, 2003, Norfolk Southern had over 28,000 employees.

factor weighs in Austin's favor.

### D.  Synthesis of the Three Guideposts

A comparison of the three guideposts set forth by the Supreme Court to determine whether a punitive damage award is grossly excessive reveals that the $175,000 in punitive damages does not comport with due process.  The most important factor, the degree of reprehensibility of the defendant's conduct, or lack thereof, weighs heavily in favor of Norfolk Southern.  The same can be said for the vast ratio between the punitive damages and the actual or potential harm to Austin.  Only the final factor, a comparison of the punitive damages she received with the statutory cap favors her.  Accordingly, the award of $175,000 in punitive damages for Austin's thirty day suspension is grossly excessive within the meaning of due process.  I would, therefore, vacate the award and remand with instructions to hold a new trial on punitive damages.

23

**Austin v. Norfolk Southern, No. 04-1568**

**NYGAARD,** *Circuit Judge*, Dissenting in part.

I join those sections of the Majority opinion that reverse the District Court's denial of Conrail and Norfolk's motions for judgment as a matter of law on Austin's claims of hostile work environment, negligent supervision.   I disagree with the Majority's treatment of Austin's retaliation claim and would affirm the District Court on that issue.

I.   The Retaliation Claim

To analyze a claim of illegal retaliation, we must follow a modified version of the burden shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *See Woodson v. Scott Paper Co*., 109 F.3d 913, 920 (3d Cir. 1997).  First, a plaintiff must establish a *prima facie* case of retaliation by showing: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action either after or contemporaneous with the protected activity; and (3) the existence of a causal connection between the protected activity and the adverse employment action.  *Id*.  If a plaintiff establishes the *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse employment action. *Id*.  At that point, a plaintiff must prove that the proffered reason was merely a pretext and that in actuality, a retaliatory animus played a determinative or at least a motivating role in

24

the employer's decisionmaking process. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003). To do this, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citation and quotation omitted).

Austin's claim of retaliation stems from her thirty-day suspension for allegedly calling her co-worker a pervert. She claims that the suspension was actually in retaliation for her complaints of sexual harassment. Norfolk Southern counters that Austin was suspended because she violated the company sexual harassment policy. The jury returned a verdict in favor of Austin on this claim and Norfolk Southern filed motions for judgment as a matter of law and a new trial, both of which the District Court denied. Although not entirely clear from its brief, on appeal, it seems Norfolk Southern contends that Austin failed to demonstrate either the causal connection prong of the *prima facie* case or that its proffered legitimate, nondiscriminatory reason was a pretext for retaliatory animus. I reject this argument.

When viewed in the light most favorable to Austin, a jury could have reasonably found both the existence of a causal connection between her complaint and her suspension and that retaliatory animus played a role in Norfolk Southern's decision to suspend her. This conclusion is supported by the fact that Norfolk Southern sent out the tape of Austin

allegedly calling a co-worker a pervert for expert analysis and yet the same was not done for the radio comments others made about her.  It is true, as Norfolk Southern points out, that Conrail was Austin's employer at the time of the offensive radio comments about her. Nevertheless, much as Austin did, nearly all of the relevant decisionmakers at Conrail took similar positions with Norfolk Southern.  Armed with this piece of evidence, a jury could reasonably have concluded that Norfolk Southern's articulated reason for suspending Austin—that she violated the sexual harassment policy—was at least partially motivated by a desire to retaliate against her for complaining about sexual harassment a few months earlier.  *Cf. Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) (noting that suspect timing, ongoing antagonism between employee and employer, and other circumstantial evidence may suffice to establish the causal connection prong of a *prima facie* retaliation claim).  Thus, Norfolk Southern's request for judgment as a matter of law must fail and, in my view, the District Court correctly denied the motion.

Norfolk Southern's motion for a new trial fails for the same reason.  When a jury verdict against the weight of the evidence results in a miscarriage of justice or shocks the conscience, a new trial should be ordered.  *Greenleaf*, 174 F.3d at 365.  However, we review a district court's determination on that question for abuse of discretion.  *Id*. Although the evidence in this case suggests that Austin did in fact violate the company sexual harassment policy, and that Norfolk Southern's suspension of Austin was done for a legitimate reason, the differing treatment of the radio comments supports a contrary

26

conclusion.   Because there is some evidence supporting the jury's verdict, I cannot say the

District Court abused its discretion by holding that the verdict was not so against the weight

of the evidence that it shocks the conscience or resulted in a miscarriage of justice.  I would

affirm the District Court's denial of Norfolk Southern's motions for judgment as a matter of

law and for a new trial on Austin's retaliation claim.

## II.  Punitive Damages

Although I would hold that Austin prevailed on her retaliation claim against Norfolk

Southern, it is important to note that the jury awarded her no compensatory damages

because her suspension was overturned by an arbitration panel and she received full back

pay for the days of work she missed.  The jury did award her $250,000 in punitive damages,

which the District Court remitted to $175,000.  Inasmuch as the Majority reverses the

District Court on Austin's retaliation claim, it does not discuss Norfolk Southern's argument

that the award of punitive damages was excessive and a violation of due process.

Due process prohibits grossly excessive or arbitrary punitive damage awards.

*Campbell*, 538 U.S. at 416.[11]  In determining whether a punitive damages award is grossly

---

[11]   More accurately, the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment prohibits state courts from imposing grossly excessive punitive damages against tortfeasors.  *Campbell*, 538 U.S. at 416. The Court has not determined whether this prohibition applies equally to the imposition of punitive damages in federal court for a violation of Title VII through the Due Process Clause of the Fifth Amendment or otherwise.  This Court has not addressed the issue either; nor did the District Court or either party.  Several Courts of Appeal, however, have applied the standard enunciated by the Supreme Court for grossly excessive punitive damage awards in state courts to Title VII cases.  *See, e.g. MacGregor v. Mallincrodkt, Inc.*, 373 F.3d 923, 932–33 (8th Cir.

(continued...)

excessive, courts must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* (citing *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996)). Each of these guideposts demonstrates that the punitive damages awarded in the present case cannot stand consistent with due process. I would reverse the District Court on this claim.

### A.  Reprehensibility

The Court has held that the degree of reprehensibility of the defendant's conduct is the "most important indicium" of the constitutionality of a punitive damages award. *Campbell*, 538 U.S. at 419. In measuring the degree of reprehensibility, we are to consider: whether the harm caused was physical as opposed to economic; whether the defendant's actions evinced indifference to or reckless disregard for the health and safety or others; the financial vulnerability of the victim; whether the conduct was repetitive or isolated; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.* The absence of all of these factors renders suspect a punitive damages award, but the existence of any one is not necessarily sufficient. *Id.*

---

[11](...continued)
2004); *E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 514 (6th Cir. 2001); *E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614–17 (11th Cir. 2000); *Romano v. U-Haul, Int'l*, 233 F.3d 655, 672–74 (1st Cir. 2000); *Deters v. Equifax Credit Info. Sys., Inc.*, 202 F.3d 1262, 1272–73 (10th Cir. 2000).

The only factor in the reprehensibility analysis that is even arguably present here is the existence of intentional malice in the suspension of Austin, and that factor is questionable.  It appears from the record that Norfolk Southern reasonably believed Austin violated the company sexual harassment policy.  It got independent expert confirmation that she referred to a homosexual co-worker as a pervert.  Because its sexual harassment policy prohibited offensive comments on the basis of sexual orientation, Norfolk Southern deemed this comment to be a violation of company policy.  Its suspension of Austin, therefore, appears to be in good faith.[12]

Moreover, no other factor in the analysis is present.  To the extent Austin suffered any harm from her suspension, *see Part II, B., infra*, it was economic not physical.  There is no evidence Norfolk Southern was indifferent to her health or safety.  Nor is there evidence that the suspension put her in a financially vulnerable position.  And, finally, the suspension was an isolated, not a repeated, incident.  For these reasons, the degree of reprehensibility of Norfolk Southern's conduct—the most important indicium of the constitutionality of a punitive damages award—is at most, rather slight.

_____

[12]  This holding may seem inconsistent with the holding in Part III, *supra*, that the jury could have reasonably found Austin's suspension to be retaliatory, but it is not.  Our ability to weigh the evidence is far greater when reviewing the award of punitive damages for excessiveness than it is when reviewing a jury verdict on a motion for judgment as a matter of law or for a new trial.  *See Campbell*, 538 U.S. at 418 (noting that appellate courts must conduct *de novo* review for claims regarding the excessiveness of punitive damages awards).  Thus, we may  import our own opinion as to the motivations behind Norfolk Southern's conduct more freely on the question of punitive damages than we may when reviewing the verdict on the retaliation claim itself.

### B.  Disparity Between the Actual or Potential Harm Suffered

### and the Punitive Damages Awarded

The Court has not set "concrete constitutional limits" on the permissible ratio between the actual or potential harm suffered by the plaintiff and the punitive damages awarded.  *Id.* at 424.  It has cautioned, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  *Id.* at 425.  A larger ratio may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages."  *Gore*, 517 U.S. at 582.  In essence, a reviewing court must determine whether the amount of punitive damages awarded is "both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *Campbell*, 538 U.S. at 426.

The amount of punitive damages awarded to Austin for her retaliatory suspension was neither reasonable nor proportionate when compared to the actual or potential harm to her from that suspension.  According to the jury, Austin suffered no actual harm; it awarded her nothing in compensatory damages.  That award indeed appears correct.  Austin lost no wages from her suspension because she was reinstated with full back pay by the arbitration panel.  Had she not been reinstated, her potential harm would have been realized as the loss of thirty days' pay.  Unless Austin's salary as an engineer was $14,583.33 a month—an almost unbelievable figure—the $175,000 in punitive damages exceeded the 10:1 ratio set forth by the Court as a benchmark.  *See Campbell*, 538 U.S. at 425.  In all probability, the

30

ratio went well beyond 10:1.

While a "particularly egregious act" by a defendant causing only a small amount of economic damages can support a larger ratio, there does not appear to be any such egregious conduct by Norfolk Southern here.  As discussed more fully in Part IV.A., *supra*, Norfolk Southern did not appear to have physically harmed Austin or have taken advantage of her financial vulnerability.  Nor did it act in bad faith.  On the contrary, it participated in the arbitration proceedings concerning Austin's suspension and abided by the arbitration panel's decision reinstating Austin with full back pay.

Austin suffered no actual harm from her suspension.  At most her potential harm was the loss of thirty days' salary.  By contrast, Austin received $175,000 in punitive damages, a figure that dwarfs even her potential harm.

### C.  Difference Between the Punitive Damages and the Civil Penalties Authorized or Imposed in Comparable Cases

Pursuant to statute, the maximum allowable award of non-economic damages for a violation of Title VII by an employer with over 500 employees is $300,000.[13]  42 U.S.C. § 1981a(b)(3)(C).  Because the punitive damage award was well under the statutory cap, this factor weighs in Austin's favor.

### D.  Synthesis of the Three Guideposts

A comparison of the three guideposts set forth by the Supreme Court to determine

---

[13]  As of December 31, 2003, Norfolk Southern had over 28,000 employees.

whether a punitive damage award is grossly excessive reveals that the $175,000 in punitive

damages does not comport with due process.  The most important factor, the degree of

reprehensibility of the defendant's conduct, or lack thereof, weighs heavily in favor of

Norfolk Southern.  The same can be said for the vast ratio between the punitive damages

and the actual or potential harm to Austin.  Only the final factor, a comparison of the

punitive damages she received with the statutory cap favors her.  Accordingly, the award of

$175,000 in punitive damages for Austin's thirty day suspension is grossly excessive within

the meaning of due process.  I would, therefore, vacate the award and remand with

instructions to hold a new trial on punitive damages.